The next case for oral argument is 19-6025, Fenway Family Pharmacy, Inc., et al., The Bank of Missouri v. Family Pharmacy, Inc., et al. The next case for But remember, we're dealing with a very specific subset of claims, secured creditors. There is something that establishes that creditor's security. In the case of a voluntary lien, you will have a security agreement. It's part of a loan transaction, potentially, that establishes what the interest rate would be. In the case of involuntary liens, which Ron Peer holds, are also entitled to post-petition interest, you will have whatever statutory mechanism grants that lien. So the fact that there's no interest rate stated does not mean there's nothing to which the court can look. So what interest rate would a court use for an involuntary lien? The statutory rate. What if there wasn't one? If there wasn't a specific, so if you didn't have a rate set forth in the statute that said... Say it's a construction lien holder. Right. You would look to the judgment lien statute. Most states, the federal government certainly has an interest rate statute that can be looked to by default. The point is, here, where you have a voluntary consensual lien, you have an agreement you can go back to that establishes what that creditor's interest rate would be. That is the bargain for a negotiated position. But weren't those the facts until there was a contract, but the court decided what interest rate on its own? But until we're dealing with a different statutory section, that it will grant the debtor the right to set the value that will be paid under the plan. In 506B, what we're talking about is... The so-called present value is what you're referring to. Correct. In 506B, what we're talking about is the determination of the claim. What establishes that claim? And 506B exists as an exception to the prohibition on post-petition interest and allows it in circumstances where you have an over-secured creditor. And the analytical framework is very straightforward. Is the claim secured? Is it over-secured? And is the interest that's being sought permitted under applicable state law? That's the exact analytical framework that this panel used in the In re White decision when it enforced an 18% default rate in a retail installment. Actually, that wasn't a default rate. That was the non-default rate. One of the rates that was set forth in the contract. It was the only rate, yeah. But it was an 18% rate, and what the court said was, it's permissible under Nebraska law, and so we're going to allow it under 506B. So is the state law issue decided by Judge Norton a mandatory precursor to applying the equitable considerations, or can you just overlook the state statute and go immediate? That's a component of those equitable standards. So do we even have to get into the state law issue? I think under Supreme Court precedent, state law is absolutely the first issue you have to look to because under the Butner decision, state law is what determines the underlying substantive claim rights of the creditor. So you have to look at that first. And that's really, I mean, if there's a concern about whether a reading of 506B that takes out equity allows too much on the creditor's side to claim whatever rate it wants, the guardrails around that would be state law, and that's the first thing you look to. Parties may have agreed to an interest rate. The question is, does state law permit that? Here in Missouri, there is no usury cap on interest rates set in commercial loan context. So you don't have a situation where the state has come in and said, notwithstanding the party's agreement to the contrary, we're going to impose a cap on interest. So are you saying that usury laws are only applicable in default situations? I mean, isn't that a different concept than default interest? No, usury would apply broadly to interest, whether it's non-default or default. And that's the mechanism for the state legislature to impose a limit on interest if it sees fit, whether that's default or not. And so here we don't have that cap. Legislature has not come in to say we're going to limit what a creditor's right to recover interest would be. And so if you get to equity under that framework, then what you've already decided is this claim is otherwise allowable under state law. But then you're going to use equity to second-guess that decision, and we don't think that's proper under either the language of 506B or under the language of the case law, which has said how this court should interpret bankruptcy code provisions in order to protect substantive state rights of the parties. So how would you address the situation in W.R. Grace, the Delaware case, as well as in your case where the debtor was current on the date of bankruptcy filing, which is the date the claim is established, right? So in W.R. Grace, the court essentially said, well, gee, the debtor was current pre-petition or on the date of filing, and therefore the debtor was without authority to make any payments post-petition without a court order or without a confirmed plan. Do you agree with that, disagree? I disagree. I mean, I understand that Grace has that language in it. I would point out that that reasoning from the W.R. Grace decision hasn't been adopted by any other court that I could find. And I think the reasoning is troubling from the perspective of if what you're saying is that under Grace, you can't ever have post-petition default by an absence of making a payment, that doesn't seem to square with how the case is. So, I mean, if that was true, you could never have a situation where, say, a debtor fails to make a mortgage payment. The argument would be, well, it's post-petition. I don't have to make a mortgage payment. And so you can't seek state relief. Well, no, the creditor is seeking an order, though, in that case. And I think what that's illustrating is it's not saying that's not a default. It's saying that the creditor's remedies upon that default may be curtailed by what the bankers. But is not default interest a remedy? Default interest would be part of a claim, to be sure. Not a remedy? How that claim gets paid is what we'd be looking at the remedy for. When there was a cash collateral agreement, your bank did not assert the default interest rate because there wasn't a default, yes? I'm not sure that's exactly the reasoning. What was the bank's reasoning for not asking for the default interest rate at the first day of the case? Or payments at all, I believe. Well, I think the biggest different fact is that on a cash collateral basis, the bank was not going to be the dip lender. So Smith had come in as the dip lender, and I believe Smith was the one negotiating what the terms of the cash collateral order would be. So in some respects, Bank of Missouri was in a bit of a passenger seat. They weren't using your collateral? They would have been. But they would also then have this line of credit from the dip lender that they would be able to look through. So they were using your cash collateral in addition to the dip lending. So wouldn't you have had a claim to assert there? But it would have been subject to the dip lender being able to set what the budget would be or an acceptable budget for the debtor. And from that perspective, I find it hard to imagine that the dip lender would want the debtor using its credit to pay the loan payments to Bank of Missouri. But you didn't even think it would want that because the dip lender is the junior secured creditor. So wouldn't it want the senior secured creditor to get paid? Well, but for the dip loan part, that got super priority over the bank's claim. And that's, in fact, what allowed Smith to credit bid the $2 million as part of the sale. It was the dip loan transaction. Before I have my time reserved for rebuttal, I do want to come back to the liquidated damages piece because we haven't really talked about that. And I think it's important. It was the first reason the bankruptcy court used. But as I pointed out, the bankruptcy court made kind of a leap in logic that assumed the default interest was the liquidated damages clause. And that's simply not the case. It's not borne out by how Missouri law interprets liquidated damages. And, in fact, there was a recent case out of California, NRA 3MB LLC 609BR841, which said exactly this, default interest is not illiquidated damages. This panel has also said in NRA direct transit 226BR198, default interest is different from liquidated damages. Default means something under the loan agreement that triggers certain rights. Liquidated damages, by contrast, is a specific sum of money fixed at the time of contracting that will be used in lieu of damages. Here, that's not what default interest does. It's not something that the parties agree is a fixed amount, nor is it something that they agree will be used in lieu of damages. And I think that's borne out by the fact that no Missouri law, there's no Missouri case law to support that extension. And neither of the parties are able to cite anything that would suggest that. In fact, the only case involving a promissory note deals with analysis of late charges under liquidated damages framework, not the default interest. But under either rationale, whether it's the default interest or the equitable consideration, both are errors as a matter of law because either it's Missouri law in the case of liquidated damages, 506B in the case of equitable consideration, neither support application as the bankruptcy court used them. We would therefore request that the decision be reversed and the case remanded instructions to enter an order allowing the default interest claim under 506B as set forth in the amended proofs of claim. I reserve the balance of my time. Thank you. Mr. Ladin. May it please the court. Darrell Ladin, Arnold Goldman Gregory for Appellee Smith Management Services. Your Honor, the appellees will split our time with approximately seven minutes for me and the remainder for Mr. Cresciani who is counsel for the other appellee, the debtors in this case. Judge Norton issued a comprehensive opinion in this case that is now reported at 605BR900 against the default interest grab here on two independent bases as has been indicated. And then, of course, questioning whether the appellant was entitled to default interest at all under the third basis. I will cover the state law issue and Mr. Cresciani will cover the 506B issue and the WR grace issue. To reverse, this court would need to rule against Judge Norton's decision to find that she was wrong on both legal bases. So she was wrong on Missouri law and she was wrong on 506. And they really need to win on the equitable, they need to win on the legal issues because they can't win once you get to the facts. And we didn't even hear one word about the evidence in this case because this really is a legal decision. The fundamental crux of appellant's position here is a sweeping one. It's that a bankruptcy court has no power or authority to disallow default interest to which a lender claims it's entitled under its loan documents. So there's some form of protective halo both under Missouri law and under the bankruptcy code on anything that is designated as interest. So take an example of a $15,000 loan or a million dollar loan. In both those cases, if the default interest is set at 150%, there's nothing that either a state court can do or a bankruptcy court can do about it. So where does the analysis begin? It begins with Missouri law. A federal court has to look to the Missouri courts. And in this case, the appellant does not rely on any Missouri case literally. Literally not one. A circuit, of course, has said the federal court looks to the courts of the state and intermediate state courts are persuasive authority that is to be followed when they're the best evidence of what the state law is. So Phillips is the case that was referred to never by name in appellant's argument. That is a Missouri court of appeals case from 2015. It applied a liquidated damages slash penalty analysis to a promissory note. Importantly, it described the note as a contract. That's all a note is. It's just another form of contract. It didn't try to distinguish between the provisions of that contract as appellant would have this court do. It didn't somehow suggest that a penalty analysis could be applied to one part of the contract or note, not another. And it also went on to describe the various components of relief sought by the lender in that instance. Well, don't we have a situation here where the bankruptcy appellate panel has already ruled on this issue in, well, a related issue in White versus Coors Distributing Company in which they said that a contract under Nebraska law that had an 18 percent rate was allowed under Nebraska law. Therefore, in the White case, the creditor was awarded interest at the 18 percent rate because it was allowed under Nebraska law. We're not in Nebraska in this case. No, I understand that. But 18 percent is allowed under Missouri law, too. But what we've got here is a difference between the rate set under a contract and a default rate. And that's a key distinction here. It doesn't matter. They're both the contract rate. There's a non-default rate and a default rate, but they're both the contract rate, are they not? They're both listed in the contract. But one of the key principles, and again, you've got to come back to Missouri law. This isn't a case of Nebraska law. It's not a case of California law. It's not a case of Massachusetts law that has the same analysis as Missouri law. But don't we all agree that Missouri doesn't prohibit an 18 percent interest rate? In fact, didn't Judge Norton find that? As a matter of law, automatically, that rate is not unenforceable. But Your Honor talked about... So that's my question, though. With that statement, are we not bound by White? No, absolutely not. The question here is, again, a default interest rate. And then, again, you look at Missouri law. The court in the Phillips case looked at this issue, and it also looked at it in the context of what courts all know is the Missouri statute at play here that's been cited, 408.035. So that is a statute that applies to interest, applies to fees, et cetera. And in the Phillips case, the court specifically found that a liquidated damages penalty analysis applies. And again, in Missouri, courts look past the labels that are placed on the terms. So just merely because something is labeled as interest, when it's a damage component, it's analyzed that way. The courts here in Missouri have made that quite clear. So you've got to start with that framework of looking at what Missouri law says. But under that analysis, isn't all default interest then a damage component or a penalty component because you're making up the difference of what you're not collecting under the note? I think default interest is a damage component, and that is what many cases say. I think there's no question that it's a damages component. And because it's a damages component, because it liquidates those damages at 18 percent, it doesn't have to liquidate them at a dollar amount. It liquidates them at 18 percent. It's subject to the analysis. And it may be a valid liquidation. But no Missouri case actually says that, does it? Pardon? No Missouri case actually says that default interest is a liquidated damage provision. It doesn't expressly say that. But there's no basis to think that the Missouri courts would treat default interest as anything different from these. And in the Phillips case. Thank you. Do you want him to finish? I was going to say other than other states don't. If I may address that, Your Honor, there are three cases that I would point the court to on that specific point. So they cited the Schuyler Ridge case from California for the proposition that the court rejected as unpersuasive a liquidated damages analysis. In fact, looking at that case. Okay. You know what? We're going way beyond. Thank you. I assume it's in your brief. John's specific description is not in the brief, but it's the Schuyler Ridge case. No. You're done. Thank you. Thank you. Mr. Cruciani. Thank you, judges. May it please the court, John Cruciani for the debtors. Your Honor, as Mr. Ladin indicated, I'll be focusing my discussion and my argument today on the 506B section on the equitable considerations. And time permitting, Your Honor, I'd also like to touch on the W.R. Grace case that Judge Saladino mentioned. Actually, I want you to go there first. Your Honor, I think it's clear under W.R. Grace and other cases in the bankruptcy code that upon the bankruptcy filing, a debtor cannot pay pre-petition indebtedness without either a confirmed plan or an order of the court. We think about the Doctrine of Necessity or critical trade treatment. That requires a court order. In order to make distributions to pre-petition indebtedness, that requires a plan or an order. The Doctrine of Necessity is just make-up law. Well, and also, isn't a debtor in possession supposed to proceed in the ordinary course of business? Wouldn't paying your secured debt be in the ordinary course of business? Your Honor, no. Paying secured debt may not be in the ordinary. It's not in the ordinary course of business. If it's appropriate for post-petition adequate protection payments to be made, then that may be included in a cash collateral or a debtor in possession budget. It's incumbent upon the debtors, the committee, if there's a committee, and the secured creditors if they believe they're entitled to adequate protection payments. But absent a court order and an approved budget, then typically you don't see cash collateral or adequate protection payments. And the other question is, is a secured creditor entitled to adequate protection post-petition during the pendency of the case? Not all secured creditors are. If there's an equity cushion, you're not entitled to one. If you're undersecured, you're not entitled to one. You're only entitled to have your collateral preserved and insured and not have it eroded unnecessarily. So how does the debtor not being allowed to pay the secured debt post-petition translate into the contract rate doesn't kick in, the contract default rate? The debtors were not in default pre-petition. There was no acceleration pre-petition. And the default that Bank of Missouri claims occurred was a result of the bankruptcy. We think that's an ipso facto provision in an effort to use the bankruptcy filing as a mechanism to implement the default rate of interest. But they're not relying on the bankruptcy filing. They're just relying on the fact that the payment wasn't made and they're not required to it. They didn't accelerate post-petition either. They're just saying the contract says if a payment isn't made, the default rate arises, period. No notices required, nothing. So why wouldn't that apply afterwards? In the contract, the note talks about other applicable law, other federal law. And, Your Honor, I would suggest that federal bankruptcy law preempts what the contract says and provides the mechanism to analyze that issue. And the W.R. Grace case said it best when it said because the bankruptcy code was the reason that Grace did not make the post-petition principal and interest payments, then Grace should not be held to be defaulted under its contractual arrangement with the bank lenders for that reason. That's exactly what the W.R. Grace said when they were really faced with a nearly identical situation to the facts that we're dealing with here. I would like to spend a few moments just talking about Section 506B, Your Honor. Your Honors, pardon me. Beginning with the statute itself, Section 506B provides that to the extent you're oversecured, there shall be allowed to the holder of such claim interest on such claim and then any reasonable fees, costs, or charges provided for under the agreement. It is clear if you're oversecured, you're entitled to interest, whether you have a consensual lien or a non-consensual lien. We've never disputed that. Ron Pehr makes that very, very clear. And Ron Pehr was only focused on whether a tax lien, a non-consensual lien, was entitled to post-petition interest. And, of course, the answer there was yes. Notably, Ron Pehr never held or set the applicable interest rate. And I think it's important to focus on the entirety of Section 506B. And why is that important? The language makes clear that Congress knew how to have the interest rate be the contract rate under the agreements if they so wanted to. They used the language provided for in that agreement when discussing fees, costs, or charges. That language is not in the interest component. If Congress wanted to make it clear that an oversecured consensual lien creditor got interest under their contract, they could have made that provision and that revision in 506B, and they did not. And, Your Honor, you referenced earlier non-consensual liens, what interest rate applies. Set-off is a secured claim under Section 506, or under 502, pardon me. That's a secured creditor. If they're oversecured, they're entitled to interest under Ron Pehr and under 506B. So I would suggest to you, and mechanics liens is another one that Your Honor mentioned, that there are several instances of non-consensual secured creditors where there isn't a readily determinable statutory interest rate. And so these courts, the bankruptcy courts, have discretion to determine what is the appropriate interest rate. But isn't that only in a case where, you know, the judgment interest rate is so low that it's unfair, as opposed to so high that it's unfair? I don't believe so, Your Honor. I think when a party, when a debtor goes into bankruptcy under Section 506B, interest is clearly in the court of the bankruptcy court to determine what the appropriate interest rate is. I think under Section 506B, you have a million-dollar loan with a 150% interest rate that doesn't have a default interest rate, and they're oversecured. 506B and the equitable considerations in the case law that we cite give the court the discretion to determine under the particular facts and circumstances of that case if a 150% contract interest rate is appropriate or not, notwithstanding that the particular state may not have a usury loan. Absolutely. I think that that's clear, and that Your Honors would not be bound by a million-dollar oversecured 150% loan even if that particular state didn't have a usury loan. Your Honor, we cited six different courts of appeals in our papers that make very clear that equitable considerations may be appropriate to determine what an appropriate interest rate is under the auspices of Section 506B. We also wanted to make clear that the Eighth Circuit spoke on this. Now, granted, it was in 1966, the Black Ranches case, and we did cite that Black Ranches case in our material. Admittedly, it's a precode case, and it's a pre-Ron Pear case, but it allowed interest at the default rate in that particular case, but it recognized that there may, quote, there may be situations where the higher rate would produce an inequitable or unconscionable result so as to require disallowance thereof. That's an Eighth Circuit court of appeals decision. That's still good law. It hasn't been changed by the code or hasn't been changed by Ron Pear Enterprises. And more recently, as we've cited in our materials, Tarchio and Payless both recognize, at least in dicta, that there are situations where an adjustment to the interest rate may be appropriate. I see I'm out of time, Your Honors. Thank you. Thank you. Thank you. Mr. Miller? Thank you. I want to come back very quickly to something Mr. Ladin said at the beginning, which was stating that our position was that the bankruptcy court has no authority to disallow interest, whatever the reason. That's actually not accurate. That's not what our position is. There are guardrails around it. State law being one of the big ones that was going to actually put the guardrails around what interest might be. And so it's not true to say we're saying that there's no recourse. There is. With respect to Judge Saladino's comment on the White case, and to tie back into what Mr. Cruciani was saying at the end, the Eighth Circuit actually has spoken on this issue. And in the White case, there was an opportunity to discuss equitable considerations, and there was no discussion of it. In fact, it employed what we think is the appropriate analytical framework. It looked under state law, if it's permissible under state law. At least so far as the claim determination goes, that rate of interest would be permitted. And it doesn't make sense to try to distinguish between default, non-default. As Judge Saladino pointed out, they're both contained in the contract, which is the source of the claim. So what you're saying is if there's no usury law, any default interest rate is enforceable? If any default rate interest is enforceable under state law, yes, for the claim determination. Now, I do want to touch upon something that came up in the Seventh Circuit's La Piana decision, which I think needs to be addressed. And there, there was some concern about, well, what if there's evidence that in that case it was the IRS, went to the trustee and said, hey, drag this thing out a little, because if you do, I've got a lot of room, I can get default interest. And the panel suggested, well, doesn't that seem like that would be inequitable? And the counsel for the government didn't really think so. And the Seventh Circuit didn't address the fact. But what they cited back to that when they're saying, if you're going to use equity, if you're going to use equity, it should depend on the circumstances of the case and be based on the conduct of the creditor, your traditional equitable defenses of things like that. But didn't your client just decide to assert the default interest rate once they figured out they were oversecured by the sale? I mean, before that, you didn't raise it. Well, but before that, there was nothing to indicate that we were going to be oversecured. And, in fact, if you look at the original stocking horse bid, we were undersecured. And so it wasn't until the sale was completed and confirmed that we actually knew the extent to which we would be oversecured. And so there's nothing really in here to point to similar circumstances that would raise those traditional equitable defenses of waiver or estoppel, latches, unclean hands, things like that. And that's really what our thrust is behind saying, to the extent the bankruptcy court could use equitable considerations, the factors this court utilized weren't actually equitable considerations. They went more to fairness and reasonableness. Looking at, is the rate too high? What's the difference between the spread? Things of that nature. And those are issues that would exist in any case. They are not dependent upon the equities of the specific case at issue, which is what Lapiana was talking about. And, in fact, some of the more recent cases that have talked about equity have focused on, including Judge Berger's recent decision out of the Hammonds case, focusing on a much more limited concept of equity that doesn't consider whether we think the rate is fair, but considers whether there's equitable considerations that would deny payment of that claim based upon the conduct. And for that reason, we request that the court reverse. Thank you, Mr. Horowitz. Thank you. The court will be in recess until further notice.